UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| R. ALEXANDER ACOSTA,<br>United States Secretary of Labor, | )<br>)<br>) | Civil Action No. 19-2793 |
| Plaintiff, | )<br>)<br>) | COMPLAINT FOR<br>ERISA VIOLATIONS |
| v. | )<br>) | (29 U.S.C. §§ 1001 et seq.) |
| WILMINGTON TRUST, N.A. f/k/a<br>WILMINGTON TRUST RETIREMENT AND<br>INSTITUTIONAL SERVICES, and the<br>STARGATE APPAREL, INC. EMPLOYEE<br>STOCK OWNERSHIP PLAN, | )<br>)<br>)<br>)<br>)<br>) | |
| Defendants. | )<br>)<br>) | |

**COMPLAINT FOR ERISA VIOLATIONS**

Plaintiff R. Alexander Acosta, Secretary of the United States Department of Labor (the "Secretary"), alleges as follows:

**PRELIMINARY STATEMENT**

1.      The Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq., requires the trustee of an employee stock ownership plan, when buying stock in the plan's sponsoring company on the plan's behalf, to act prudently and with undivided loyalty to the plan, and to pay no more than fair market value for the stock.  When Wilmington Trust, N.A. ("Wilmington"), as trustee of the Stargate Apparel, Inc. Employee Stock Ownership Plan (the "ESOP"), committed the ESOP in March of 2011 to pay $46 million for 83% of the stock in the ESOP's sponsoring companies ("the Transaction"), it failed in each of these respects.

2.      First, to determine whether it was paying fair market value for stock in Stargate Apparel, Inc. ("Stargate") and its sister company, Rivstar Apparel, Inc. ("Rivstar") (collectively, the "Companies")—both of which are privately held companies with no publicly available fair

market value—Wilmington hired a conflicted appraisal firm that was not independent of the selling shareholder (the ESOP's counterparty in the Transaction). Not only was Wilmington's appraiser pre-selected for Wilmington by the financial advisor for the selling shareholder, but it had just weeks earlier performed a valuation for the selling shareholder of the very stock it would now be valuing for Wilmington and the ESOP.

3.     Second, despite learning of a lawsuit filed just months before the Transaction accusing Rivstar of accounting irregularities, Wilmington relied for its valuation on unaudited financial statements that were internally prepared by the Companies. Those internal statements, which showed a dramatic increase in earnings and unexplained efficiency gains over the previous years' audited statements, would prove to deviate substantially from the Companies' audited statements released shortly after the Transaction closed.

4.     Third, Wilmington failed to negotiate in good faith. Wilmington negotiated the Transaction price before receiving even a draft valuation report from its appraiser, and just days after learning of the lawsuit against Rivstar. It also agreed to transfer the Companies' trademarks to the selling shareholder—thus stripping the Companies of prime assets—without attempting to extract a reduction in the purchase price.

5.     Fourth, Wilmington relied on a valuation report rife with red flags, including projections of Stargate's and Rivstar's future financial performance that far outpaced their modest historical performance with no articulated reason for such a substantial surge in growth.

6.     By the actions and omissions specified above, Wilmington breached its duties of prudence and loyalty, in violation of 29 U.S.C. § 1104(a)(1)(A) and (B), and entered into a non-exempt prohibited transaction, in violation of 29 U.S.C. § 1106(a). In so doing, Wilmington caused the ESOP to overpay for stock in the Companies by tens of millions of dollars. As a

result, the Secretary brings this action against Wilmington under 29 U.S.C. § 1132(a)(2) and (5) to redress Wilmington's violations of ERISA and enforce the provisions of Title I of ERISA.

**JURISDICTION AND VENUE**

7.     This Court has jurisdiction over this action pursuant to 29 U.S.C. § 1132(e)(1).

8.     Venue with respect to this action lies in the United States District Court for the Southern District of New York, pursuant to 29 U.S.C. § 1132(e)(2), because the ESOP is administered in New York City, New York, within this district, and the fiduciary breaches at issue in this Complaint occurred within this district.

**PARTIES**

9.     The Secretary is vested with authority to enforce Title I of ERISA by, among other things, filing and prosecuting claims against fiduciaries and other parties who violate ERISA.  29 U.S.C. § 1132(a)(2), (5).

10.     Wilmington is a full-service trust company with its principal place of business in Wilmington, Delaware.  Its services include acting as the trustee of employee stock ownership plans.  At all relevant times, Wilmington was trustee of the ESOP and a fiduciary to the ESOP under 29 U.S.C. § 1001(21).

11.     The ESOP is an employee benefit plan as defined by 29 U.S.C. § 1002(3) and subject to coverage under ERISA pursuant to 29 U.S.C. § 1003(a)(1).  The ESOP also includes the Stargate Apparel, Inc. Employee Stock Ownership Trust, which holds the ESOP's assets. The ESOP is joined as a party defendant pursuant to Rule 19(a) of the Federal Rules of Civil Procedure solely to assure that complete relief can be granted.

## FACTUAL BACKGROUND

12.     Stargate and Rivstar are private companies that design and market denim jeans and swimwear primarily for the junior markets.

13.     In 2010, the year before the ESOP Transaction, the Companies generated about half of their revenues from selling private-label products—i.e., products manufactured for retailers under the retailers' own brand names—with the other half derived from the Companies' proprietary brands.

14.     The Companies' customer base in 2010 was composed of mass merchants, department stores and discount chains.  Their top three customers by revenue in 2010 were Target (36.5%), Wal-Mart (18.2%), and Marmaxx (12.9%).

15.     The Companies' common ownership dates back to 2008, when Stargate bought a distressed apparel business and renamed it Rivstar.

16.     Prior to the ESOP Transaction, Joseph Bailey ("Bailey"), Stargate's founder and the Companies' CEO, owned 100% of Rivstar and 99.99% of Stargate.  The remaining 0.01% of Stargate was owned by Rivstar.

### Bailey Hires CSG to Spearhead ESOP Transaction

17.     Late in the summer of 2010, Bailey hired CSG Partners, LLC ("CSG") as his financial advisor to evaluate the feasibility of creating an ESOP at his Companies.

18.     In September 2010, Bailey engaged CSG again, this time to represent him in a possible ESOP transaction and to manage the ESOP implementation process.  CSG duties included advising on the hiring of valuation experts, trustees, and other service providers necessary to carry out an ESOP transaction.

19.     Because the Companies are not publicly traded and do not have a readily available fair market value, the engagement agreement also contemplated that CSG would first arrange for an initial valuation of the Companies to be provided to Bailey.

### CSG Hires MHP to Provide Bailey with an Initial Valuation

20.     In October 2010, on CSG's recommendation, Bailey (on the Companies' behalf) engaged Meyers, Harrison & Pia, LLC ("MHP") to conduct an initial valuation of the Companies.

21.     On October 20, 2010, before MHP had valued the Companies, a CSG representative told MHP that the offer Bailey planned to make to the ESOP's eventual trustee was "going to be around 50mm for 80pct with 48 pct warrants."

22.     Nine days later, on October 29, 2010, MHP delivered a draft valuation report that estimated the fair market value of an 80% ownership in the Companies as between $45 million to $47 million.

### Wilmington Is Appointed ESOP Trustee

23.     After Bailey agreed to pursue an ESOP transaction following his receipt of MHP's initial valuation, CSG needed to identify a trustee to represent the ESOP in a prospective transaction.  It reached out to Wilmington, which at the time of the ESOP Transaction counted CSG as its most significant referral source for ESOP-trustee work.

24.     On December 15, 2010, Bailey executed a trustee engagement agreement on behalf of the Companies that formally retained Wilmington as the ESOP's trustee to evaluate and negotiate the ESOP Transaction on the ESOP's behalf (the "Trustee Engagement Agreement").

25.     The Trustee Engagement Agreement contains an indemnification provision requiring the Companies to indemnify Wilmington for any loss, cost, expense or other damage,

including attorney's fees, from any legal proceedings related to services provided by Wilmington pursuant to the Trustee Engagement Agreement.  The only circumstance in which the Companies need not indemnify Wilmington is if a court, in a final judgment from which no appeal can be taken, holds that the loss, cost, expense or damage resulted either from Wilmington's gross negligence or willful misconduct.

26.     On December 30, 2010, Wilmington and Stargate entered into a trust agreement setting forth the duties and responsibilities of Wilmington as the ESOP's trustee, effective as of January 1, 2010 (the "Trust Agreement").

27.     Among the trustee's enumerated duties is to select an independent appraiser for all valuations of shares of company stock, and to only buy company stock "at a price that does not exceed the fair market value, as determined by an Independent Appraiser if such stock is not publicly traded."

28.     The Trust Agreement further provides that the trustee shall discharge its duties "solely in the interest of Participants and other persons entitled to benefits under the Plan," "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," and "in accordance with the documents and instruments governing the Plan . . . . "

### Wilmington Hires MHP as Its Appraiser

29.     Although it was Wilmington's duty to hire an independent appraiser, CSG— which represented Bailey (the party adverse to the ESOP)—already had been communicating for the past month with MHP, the appraiser that Wilmington would go on to retain, about the prospect of MHP serving as the trustee's appraiser.

30.     For example, on November 9, 2010, MHP asked CSG "if you would like us to issue an Engagement Letter for the second phase and who the trustee will be."  And on December 9, 2010, before Wilmington was retained as trustee, CSG invited MHP to a due diligence meeting for the ESOP Transaction and asked "did we ever get your second stage engagement for this deal?"  MHP replied that it would send one out "asap."

31.     The very next day, on December 10, 2010, MHP sent Wilmington an engagement agreement.  Wilmington countersigned the engagement agreement with MHP on December 15, 2010, the same day Wilmington was retained as the ESOP's trustee.

**Wilmington Negotiates Transaction Price Before Receiving Valuation Report**

32.     Before Wilmington had received even a draft valuation report from MHP, Wilmington and its legal counsel started negotiating the ESOP transaction price with CSG and Bailey's legal counsel.

33.     On January 21, 2011, Bailey made an offer to Wilmington to sell 80% of the Companies to the ESOP for $48 million.  Without having seen a draft valuation report, Wilmington made a counteroffer of $46 million on January 28, 2011.  Bailey responded with a counteroffer of $47 million that same day.

34.     On January 30, 2011, Wilmington learned of a lawsuit alleging accounting irregularities at Rivstar that Wilmington's legal counsel described as "rather serious."  The complaint alleged that an independent third party hired by the plaintiff had discovered "numerous accounting discrepancies in Rivstar's books and records." The complaint sought a judgment of "not less than $2.7 million."

35.     On February 1, 2011—a mere two days after learning of the allegations—Wilmington continued negotiating the transaction price, making a counteroffer to buy 82% of the Companies for $45 million.

36.     On February 3, 2011, CSG informed Wilmington's legal counsel that a purchase price of $46 million for 83% of the Companies' stock was "fine." That would prove to be the final price of the transaction.

37.     It was not until the next day, February 4, 2011, that Wilmington received a draft report from MHP valuing the Companies.

**MHP's Valuation Report Contains Numerous Red Flags**

38.     MHP's valuation report concluded that an 83% stake in the Companies was worth between $44.8 million to $48.5 million, which closely circumscribed the already agreed-upon $46 million purchase price.

39.     To arrive at its valuation conclusion, MHP used two valuation methods to which it assigned equal weight: (1) the Discounted Cash Flow Method ("DCF Method") and (2) the Guideline Company Method.  The DCF Method relies on projections of a company's future earnings and revenue stream in order to derive the company's expected future cash flows, and then values the company by translating those cash flows into their present value equivalent.  The Guideline Company Method values a company by comparing it to similar publicly traded companies whose market values are readily ascertainable.

*MHP Relied on Overly Aggressive Projections of the Companies' Sales and Earnings and Unduly Modest Projections of Operating Expenses and Working Capital Needs*

40.     On its face, MHP's valuation of the Companies inexplicably relied on revenue projections for the Companies that outstripped their historical performance, and on expense projections that were more modest than the Companies' historical rate of expenditures.

8

41.     With respect to revenue, Stargate's compound average annual sales growth from 2006 to 2010 was 6.1% per year.  Yet MHP relied on management's projections that, from 2011 to 2015, Stargate's revenue would grow at an average yearly rate of 11%.

42.     Rivstar did not grow at all from 2009 to 2010, its only full years under Stargate's management at the time of the ESOP Transaction.  Yet MHP relied on management's projections that, from 2011 to 2015, Rivstar's revenue would grow at an average yearly rate of 11%.

43.     With respect to spending, between 2006 and 2010 Stargate's average operating expenses as a percentage of its revenues was 19%.  Yet MHP relied on management's projections that Stargate's operating expenses as a percentage of its revenue would somehow decline to an average of 10.5%.

44.     From 2009 to 2010, Rivstar's average operating expenses as a percentage of its revenues was 14.9%.  Yet MHP relied on management's projections that, from 2011 to 2015, Rivstar's operating expenses as a percentage of its revenue would decline to an average of only 11.5%.

45.     A second expense-side projection is the working capital needed to support the Companies' projected growth.  MHP relied on a projection that the Companies' working capital to sales ratio would be 5%, which it claimed was the Companies' historical average.  In fact, the Companies' average combined working capital to sales ratio from 2006 to 2010 was 12.4%—more than twice the projection used by MHP.

*MHP Relied on Questionable Earnings Data Reported on the Companies' Internal Financial Statements*

46.     At the time of the ESOP Transaction, the Companies' 2010 audited financials had not been released.  Without audited financial statements, MHP relied instead on the Companies' internally prepared statements for that year.

47.     Those internal statements reported that the Companies had paid only $156,000 in salary and other compensation to the Companies' officers in 2010, despite having paid the officers nearly $1.2 million in the prior year.  MHP's report did not explain this disparity.

48.     The Companies' 2010 internal statements also represented that their net income had jumped from approximately $2.8 million in 2009, to nearly $6.5 million in 2010.  MHP's report did not explain this disparity either.

### *MHP Made Unjustified Adjustments to Increase the Companies' Valuation*

49.     At the time of the ESOP Transaction, the majority of the Companies' reported debt was comprised of a loan from Bailey to the Companies of approximately $7 million.  In its valuation report, MHP explained that this loan was made in order "to support the Companies' working capital needs."

50.     Instead of subtracting the full amount of the $7 million loan in its valuation of the Companies, MHP subtracted the supposed present value of the loan, which it said was only around $3.8 million.  Reducing the value of the Companies' debt in this way allowed MHP to increase its valuation of the Companies.

51.     MHP further increased its valuation of the Companies by $3.25 million to account for "excess working capital" that the Companies supposedly had.  MHP's report contained no explanation justifying its determination that the Companies had $3.25 million in excess working capital.  Nor did MHP attempt to reconcile its conclusion that the Companies had $3.25 million in excess working capital with its acknowledgment elsewhere in its report that Bailey had to loan the Companies $7 million specifically "to support the Companies' working capital needs."

*MHP Did Not Account for the Dilutive Effect that the Warrants Issued to Bailey Would Have on the ESOP's Equity Interest*

52.     In connection with the ESOP Transaction, Bailey received warrants allowing him, at any point in time over the next 15 years, to acquire up to 45% of the Companies' stock at agreed-upon "strike prices" regardless of the Companies' fair market value at the time.  Were Bailey to exercise that right, the ESOP's equity interest in the Companies would be substantially diminished.

53.     Nevertheless, MHP did not reduce its valuation to account for the dilutive effect the warrants might have on the ESOP's ownership interest, nor did it include the value of the warrants in the total consideration the ESOP paid to Bailey for the stock.  Instead, it simply stated that the warrants were "fair to the ESOP."

*MHP Valued the Companies by Comparing Them to Publicly Traded Companies That Differed in Material Respects*

54.     In applying the Guideline Company Method, MHP selected four publicly traded companies whose product lines and operations it deemed "similar" to the Companies': Perry Ellis International, Inc., Oxford Industries, Inc., V.F. Corp., and Warnaco Group, Inc. (collectively, the "Guideline Companies").

55.     The Guideline Companies, howevery, primarily sell premium "branded" apparel under their own name brands, and often in their own retail stores.  In addition, apparel offered by the Guideline Companies under many of their brands, like The North Face and Calvin Klein, can retail for hundreds of dollars.

56.     In contrast, the year before the ESOP Transaction, half of Stargate and Rivstar's combined revenues came from selling private-label products, while the "two leading denim

brands within Stargate," Blue Epic and Freestyle, were sold at retail prices of approximately $9.99 to $34.99.

### Wilmington Approves the ESOP Transaction Without Addressing the Red Flags in the MHP Report

57.     On February 8, 2011, Wilmington held a meeting to review the proposed ESOP Transaction.

58.     The meeting minutes do not reflect any discussion of the following topics:

a.     the discrepancy between the Companies' historical and projected revenue-growth and expenditure rates;

b.     whether the lawsuit against Rivstar alleging accounting irregularities was cause for concern over the integrity of the Companies' internally prepared financial information for 2010;

c.     whether it was appropriate for MHP to add $3.25 million in excess working capital to its valuation of the Companies;

d.     whether it was appropriate for MHP to subtract from its valuation only the "present value" of the $7 million loan from Bailey rather than its face value;

e.     whether MHP should have reduced its valuation (or increased the total consideration paid to Bailey) in light of the warrants issued to Bailey; or

f.     whether MHP's Guideline Companies were in fact comparable to Stargate and Rivstar.

59.     At the conclusion of the meeting, Wilmington formally approved the ESOP Transaction at the $46 million purchase price for an 83% interest, to be followed by the Companies redeeming Bailey's remaining 17% of stock in each of the Companies in exchange for warrants to purchase up to 45% of the Companies.

### Wilmington Agrees to Transfer the Companies' Trademarks to Bailey Without a Reduction in the Purchase Price

60.     After the purchase price had been agreed upon, Bailey sought to obtain a new deal term: royalty-free licenses to exploit the Companies' existing trademarks.

61.     MHP suggested to Wilmington that instead of granting licenses to Bailey so that he could exploit the Companies' trademarks (as Bailey had proposed), the Companies could simply transfer their trademarks outright to Bailey, and Bailey would in turn grant the Companies royalty-free licenses to use what would now be Bailey's trademarks.

62.     Based on MHP's suggestion, Wilmington proposed to Bailey's representatives that the Companies would transfer their trademarks to Bailey.  In return, Wilmington asked that Bailey agree to reduce his previously agreed-upon performance-based bonuses, and to remit to the Companies any royalty payments that he received from licensing the trademarks over the next five years.  Wilmington did not ask for a reduction in the purchase price.

63.     CSG flatly rejected reducing Bailey's bonus structure.  Nonetheless, Wilmington—with no further negotiations—agreed to give up the Companies' trademarks for nothing other than five years of royalty payments (to the extent Bailey earned any).  While the Companies would receive from Bailey a royalty-free license to exploit the trademarks free of charge, that license would last only for as long as the ESOP controlled the Companies.  If at any point the ESOP no longer controlled the Companies, the Companies would then be obligated to pay Bailey a 3% royalty to exploit the trademarks.

64.     Because of this trademark transfer, if the ESOP were to try and sell its stock in the Companies following the ESOP Transaction to a third party buyer, it would be selling stock in Companies that were merely apparel licensees.  In addition, because the Companies' right to exploit Bailey's trademarks royalty-free applied only as long as the ESOP controlled the

Companies, a subsequent buyer would not have that right and would have to pay royalties to Bailey.

65.     In its final valuation report, MHP did not reduce its valuation to reflect the Companies' transfer of their trademarks to Bailey.

### **Wilmington Enters Into $46 Million Stock Purchase Transaction**

66.     On March 24, 2011, the ESOP purchased 83% of the Companies' stock for a total purchase price of $46 million.

67.     Immediately following the ESOP Transaction, the Companies transferred their trademarks to Bailey Brands Holdings, LLC, the company newly formed by Bailey to receive the trademarks.

68.     On March 29, 2011, the Companies redeemed Bailey's remaining shares of stock in both Rivstar and Stargate in exchange for five shares of non-voting stock in each of the Companies and warrants to purchase up to 45% of the outstanding stock of each of the Companies over a 15-year span at agreed-upon strike prices.

### **The Companies' 2010 Audited Financial Statements Differ from the Companies' 2010 Internal Statements**

69.     As alleged in paragraphs 46-48 above, in preparing its valuation report, MHP relied on the Companies' internally prepared financial statements for the year ending on December 31, 2010 despite learning of "rather serious" allegations of accounting irregularities lodged against Rivstar.

70.     On June 7, 2011—about ten weeks after the transaction closed—the Companies' outside accountant issued an independent auditor's report of the Companies' financial statements for the year ending December 31, 2010.

71.     The audited financials for 2010 revealed that the Companies' combined officer compensation for 2010 was more than $1.1 million—far higher than the $156,000 reported on the Companies' internal financial statements for 2010.

72.     The audited financials for 2010 also reported combined net income in 2010 of $2,085,980—far below the combined net income of $6,487,102 reported on the Companies' internal financial statements for 2010 upon which MHP relied, and in line with the prior year's net income.

## FIRST CLAIM FOR RELIEF
### (Against Defendant Wilmington for Violating Its Fiduciary Duties)

73.     Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 72 inclusive.

74.     As the ESOP's fiduciary, Wilmington had a duty to act prudently and solely in the interest of the ESOP and its participants and beneficiaries.  These duties required Wilmington to, among other things, hire an appraiser that was truly independent of the selling shareholders; undertake a good-faith investigation of the merits of the transaction and any red flags that arose; conduct good faith negotiations over the transaction's price and other material terms; and thoroughly review, analyze, and question any valuation report on which it relied.  Wilmington failed in each of these respects.

75.     First, Wilmington failed to hire an independent appraiser.  It instead hired one (MHP) that had been pre-selected by the agent for the selling shareholder, and which had just weeks earlier performed a valuation for the selling shareholder of the same stock that Wilmington was now asking it to value for the ESOP.  Wilmington either failed to investigate

MHP's prior relationship with Bailey and CSG, or hired MHP knowing that MHP had previously worked for Bailey in connection with the same proposed transaction.

76.     Second, Wilmington accepted at face value the Companies' internally prepared financial statements for 2010 even though Wilmington was aware of recent allegations of accounting irregularities lodged against Rivstar, and even though those internal statements showed a dramatic increase in earnings and unexplained efficiency gains over the previous years.

77.     Third, Wilmington did not negotiate in good faith over the stock purchase price and the trademark transfer agreement.  Wilmington negotiated the purchase price before it had received even a draft valuation report, and shortly after learning of a lawsuit against Rivstar alleging accounting irregularities.  It further agreed to transfer the Companies' trademarks to Bailey—thus denuding the Companies of prime assets—without even attempting to extract a reduction in the purchase price.

78.     Fourth, Wilmington failed to scrutinize and critically question MHP's valuation report, which raised a number of red flags, including:

        a.      Relying on projections of the Companies' future revenue and earnings that far outstripped the Companies' historical performance;

        b.      Relying on projections of the Companies' future operating expenses that were far more modest than the Companies' historical spending;

        c.      Relying on internal financial statements provided by the Companies that were questionable on their face;

        d.      Failing to reduce the valuation to account for the Companies' transfer of their trademarks to Bailey;

16

e.      Making unjustified upward adjustments to the Companies' value by discounting the Companies' debt and adding supposedly excess working capital to its valuation; and

f.      Failing to reduce its valuation of the Companies' stock based on the dilutive effect of the warrants, or to include the value of the warrants in the total consideration the ESOP paid to Bailey for the stock.

79.     By failing in all of the foregoing respects, Wilmington:

a.      Caused the ESOP to purchase the Companies' stock for significantly more than fair market value;

b.      Failed to discharge its duties with respect to the ESOP solely in the interest of the participants and beneficiaries of the ESOP and for the exclusive purpose of providing benefits and defraying reasonable expenses of plan administration, in violation of 29 U.S.C. § 1104(a)(1)(A);

c.      Failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of 29 U.S.C. § 1104(a)(1)(B); and

d.      Failed to act in accordance with the documents and instruments governing the ESOP insofar as such documents and instruments are consistent with ERISA, in violation of 29 U.S.C. § 1104(a)(1)(D).

80.     As a result of the conduct described above, Wilmington caused losses to the ESOP for which it is liable pursuant to 29 U.S.C. § 1109(a).

### SECOND CLAIM FOR RELIEF

**(Against Defendant Wilmington for Engaging in a Prohibited Transaction)**

81.     Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 80 inclusive.

82.     As a fiduciary to the ESOP, Wilmington was prohibited from causing or permitting the ESOP to engage in a transaction that constitutes the sale or exchange of property between the ESOP and a "party in interest" to the ESOP, and was prohibited from transferring any assets of the ESOP to a party in interest.  29 U.S.C. § 1106(a)(1)(A), (D).

83.     As the owner of 99.99% of Stargate's stock and 100% of Rivstar's stock at the time of the ESOP Transaction, Bailey was a "party in interest" to the ESOP under 29 U.S.C. § 1002(14)(E)(i).  Bailey was also a "party in interest" to the ESOP under 29 U.S.C. § 1002(14)(H) by virtue of his position as the Companies' CEO.

84.     By causing the ESOP to purchase the Companies' stock from Bailey pursuant to the ESOP Transaction, Wilmington:

        a.     Caused the ESOP to engage in a transaction that it knew or should have known constituted the sale or exchange, or leasing, of any property between the ESOP and parties in interest, in violation of 29 U.S.C. § 1106(a)(1)(A); and

        b.     Caused the ESOP to engage in a transaction that that it knew or should have known constituted direct or indirect transfers of the ESOP's assets to, or use of the ESOP's assets by or for the benefit of, parties in interest, in violation of 29 U.S.C. § 1106(a)(1)(D).

85.     As a result of the conduct as described above, Wilmington caused losses to the ESOP for which it is liable pursuant to 29 U.S.C. § 1109(a).

### THIRD CLAIM FOR RELIEF

#### (Against Defendant Wilmington for Entering into
#### Indemnification Agreement that is Void under ERISA)

86.     Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary

adopts and incorporates by reference the averments and allegations of paragraphs 1 through 85

inclusive.

87.     ERISA section 410(a) provides that "any provision in an agreement or instrument

which purports to relieve a fiduciary from responsibility or liability for any responsibility,

obligation or duty under this part shall be void as against public policy[.]"  29 U.S.C. § 1110(a).

A fiduciary is impermissibly relieved of responsibility or liability for its ERISA fiduciary duties

when an ERISA plan itself bears some of the burden of indemnifying a fiduciary for its fiduciary

breaches.  See 29 C.F.R. § 2509.75-4.

88.     As set forth in paragraph 25 above, the indemnification provision in Wilmington's

Trustee Engagement Agreement could require the Companies—and, in turn, the ESOP as the

Companies' sole owner—to pay all of Wilmington's losses, costs, expenses and damages

incurred in connection with any legal proceeding relating to Wilmington's performance as the

ESOP's trustee even where Wilmington has violated its fiduciary duties under ERISA.

89.     By potentially requiring the ESOP to indemnify Wilmington even where it has

breached its fiduciary duties, the indemnification provision is void under 29 U.S.C. § 1110(a).

**PRAYER FOR RELIEF**

WHEREFORE, the Secretary of Labor prays that this Court enter an Order:

1.       Requiring Wilmington to restore all losses caused to the ESOP as a result of Wilmington's fiduciary breaches, plus interest.

2.       Requiring Wilmington to disgorge, and restore to the ESOP, all fees earned from the ESOP Transaction and fees subsequently paid to it as ongoing trustee of the ESOP.

3.       Declaring that the indemnification provision in the Trustee Engagement Agreement is void under ERISA, enjoining Wilmington from seeking or receiving any payments under this indemnification provision, and requiring Wilmington to repay to the Companies any amounts paid by the Companies pursuant to this indemnification provision.

4.       Granting such other relief as may be equitable, just and proper.

Dated:  March 28, 2019               Respectfully Submitted,


KATE O'SCANNLAIN
Solicitor of Labor

G. WILLIAM SCOTT
Associate Solicitor
Plan Benefits Security Division

ROBERT FURST
Counsel
Plan Benefits Security Division

 /s/ Jeffrey Hahn
JEFFREY HAHN
BLAIR BYRUM
ISIDRO MARISCAL
Office of the Solicitor
Plan Benefits Security Division
U.S. Department of Labor
P.O. Box 1914
Washington, DC  20013
Tel: (202) 693-5600
Fax: (202) 693-5610
Hahn.Jeffrey.M@dol.gov
Byrum.Blair.L@dol.gov
Mariscal.Isidro@dol.gov

Attorneys for Plaintiff